# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| TRACY HARRELL, | Civil No. 16-737 (JRT/FLN) |
| Plaintiff, | |
| v. | |
| HANDI MEDICAL SUPPLY, INC., | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Joni M. Thome and Cassie C. Navarro, **BAILLON THOME JOZWIAK & WANTA LLP**, 100 South Fifth Street, Suite 1200, Minneapolis, MN 55402, for plaintiff.

Lee A. Lastovich and Alyssa M. Toft, **JACKSON LEWIS P.C.**, 150 South Fifth Street, Suite 3500, Minneapolis, MN 55402, for defendant.

Plaintiff Tracy Harrell filed a complaint in Minnesota state court against her former employer Defendant Handi Medical Supply, Inc. ("HMS") alleging claims under the Family Medical Leave Act ("FMLA") and Minnesota Human Rights Act ("MHRA"). All of the claims relate to Harrell's termination from HMS on August 11, 2015. HMS removed the case to federal court and, in February 2017, moved for summary judgment on all claims. The Court will grant HMS's motion for summary judgment, finding that HMS has presented sufficient facts to show a legitimate non-retaliatory and non-discriminatory reason for terminating Harrell's employment, namely Harrell's derogatory comments about HMS, and Harrell has not demonstrated sufficient evidence that the reason was in any way a pretext for discrimination.

# BACKGROUND

## I.  THE PARTIES

HMS is a medical equipment and supply company based in St. Paul, Minnesota. (Notice of Removal, Ex. A ("Compl.") ¶ 4, Mar. 22, 2016, Docket No. 1; Decl. of Alyssa M. Toft ("Toft Decl."), Ex. E at 30, Feb. 1, 2017, Docket No. 24.)  The mission of HMS is "To Enrich Lives," (Toft Decl., Ex. E at 32), and this mission is central to the work of HMS employees, (*see id.*, Ex. A ("Harrell Dep.") at 60:1-22, 86:17-87:3).

HMS employed Harrell from July 2012 through August 2015.  (*Id.*, Ex. U.) Harrell held the role of Lead Customer Service Representative ("Lead CSR") and managed day-to-day operations of the Customer Service Department.  (*Id.*; *see also* Harrell Dep. at 63:11-22.)  At the time relevant to this case, the management structure of Harrell's team included:  Mike Bailey – Chief Executive Officer; Scott Learned – Chief Operating Officer; Julie Peterson – Human Resources Manager; Kerstin Deters – Manager of Customer Service and Harrell's immediate supervisor; Harrell and Michelle Morgan – Lead CSRs; and ten to fifteen individual Customer Service Representatives ("CSRs").  (Harrell Dep. at 61:16-21, 72:4-73:1, 73:9-14, 91:3-8, 133:12-16; Toft Decl., Ex. L.)

## II.  HARRELL'S CAREER PERFORMANCE

By all accounts Harrell had a successful career performance at HMS.  Harrell received numerous "Enrichment Award Nomination[s]" for her work with co-workers and clients.  (Decl. of Joni M. Thome ("Thome Decl."), Ex. A, Feb. 22, 2017, Docket

No. 28.) Deters described Harrell as generally respectful in the workplace, (*id.*, Attach. 2, Dep. of Kerstin Deters-Engel ("Deters Dep.") at 105:3-106:17), and evaluated Harrell as "exceeds expectations" at her last performance review before termination, (*id.*, Ex. B at 20).

Even so, Harrell did have some incidents of unprofessional conduct during her tenure at HMS. (*See* Toft Decl., Ex. F at 82; *id.*, Exs. G-I.) And at Harrell's final performance review, Deters indicated that Harrell's "biggest opportunity for growth" was in "[r]espect." (Thome Decl., Ex. B at 22.) This evaluation was, in part, based on co-workers indicating Harrell only sometimes showed respect in the workplace. (*Id.* at 26.)

## III.    HARRELL'S FMLA LEAVE

Harrell became eligible for FMLA leave in July 2013. Harrell applied for intermittent FMLA leave "to assist [her] spouse with serious mental health illness." (Toft Decl., Ex. K at 31.)[1] HMS granted Harrell's FMLA leave request, (*id.* at 24), and Harrell remained approved for intermittent FMLA leave until her termination in August 2015, (*see id.* at 13-15). When Harrell took FMLA leave, Harrell spoke with either Deters or Peterson. (Harrell Dep. at 97:21-98:3.) Harrell agreed that she did not "experience any resistance" from HMS about taking FMLA leave, (*id.* at 97:5-9), HMS never denied Harrell FMLA leave, (*id.* at 98:22-99:6), and – other than the incident at issue in this case – HMS never disciplined Harrell for taking FMLA leave, (*id.* at 99:14-20).

---

[1] The page numbers cited for Exhibit K are to the Bates numbers indicated on the document with the omission of all "0s" preceding the number.

## IV.     THE AUGUST 5, 2015, INCIDENT

At some point during Harrell's employment, HMS determined it needed to make changes to the Customer Service Department because of poor response time to customer calls.  Bailey decided to make certain temporary changes, including Deters "assum[ing] the role of [Lead CSR]" while "retain[ing] the title of Customer Service Manager" and Harrell and Morgan "assum[ing] the role of [CSR] while retaining the title of [Lead CSR]."  (Toft Decl., Ex. L.)  The move did not result in a change in salary.  (*Id.*, Ex. D ("Bailey Dep.")[2] at 61:9-11.)

On August 5, 2015, Bailey met with Learned, Peterson, Deters, Morgan, and Harrell to discuss the temporary changes.  (Harrell Dep. at 133:5-11).  According to Harrell, Bailey complained that Harrell and Morgan were working too few hours and commented that, even though "he knew something was going on in [Harrell's] life," Harrell needed to invest more time in HMS.  (*Id.* at 134:7-135:4.)  The temporary changes upset Harrell, and Harrell felt the temporary changes were unfair.  (*Id.* at 136:15-17, 137:16-17.)

After the meeting, Harrell returned to her desk, which was located in an area open to both HMS employees and customers.  (*Id.* at 144:3-14.)  Harrell sat near Sabrina Newson, Spencer Wallace, and LaShawnda Demry.  (*Id.* at 145:6-8.)  Harrell acted upset

---

[2] Harrell also submitted excerpts of Bailey's deposition testimony.  (*See* Thome Decl., Attach. 2 at 19-40.)  To the extent pages of Bailey's deposition were not submitted in the Toft Declaration, the pages are attached to the Thome Declaration.

while at her desk, (Decl. of Michelle Morgan ¶ 7, Feb. 1, 2017, Docket No. 20), and twenty to thirty minutes later, Harrell emailed her husband stating "I really need to talk to you, I am upset," (Harrell Dep. at 147:15-148:1). Harrell borrowed Morgan's cellphone and called her husband. (*Id.* at 148:2-4.) During the call, Harrell's husband became angry and threatened to go to HMS and talk to Bailey. (*Id.* at 155:13-15, 158:3-7.) Harrell felt she needed to return home to help her husband. (*Id.* at 162:21-23.) Harrell told Peterson she needed to take FMLA leave, and Peterson approved the leave. (*Id.* at 162:12-163:12.)

After talking with Peterson, Harrell returned to her desk, "took off [her] badge . . . swung it around [her] hand, like [she] usually [did], and threw it in her purse." (*Id.* at 164:5-8; *see also* Toft Decl., Ex. B ("Learned Dep.")[3] at 30:10-12 (Harrell's co-worker describing Harrell "throwing her items in her bag").) Then, Newson approached Harrell to ask a work-related question, to which Harrell responded "[y]ou are going to need to talk to [Deters]. I am done. I got to go. I am done right now." (Harrell Dep. at 164:9-13). Harrell's co-workers contend Harrell actually used profanity in her interaction with Newson. (*See* Learned Dep. at 30:11-12; Decl. of Mollie King ("King Decl.") ¶ 3, Feb. 1, 2017, Docket No. 21; Decl. of LaShawnda Demry ("Demry Decl.") ¶ 3, Feb. 1, 2017, Docket No. 22; Decl. of Sabrina Newson ¶ 2, Feb. 1, 2017, Docket No. 23.)

---

[3] Harrell also submitted excerpts of Learned's deposition testimony. (*See* Thome Decl., Attach. 2 at 41-54.) To the extent pages of Learned's deposition were not submitted in the Toft Declaration, the pages are attached to the Thome Declaration.

Some evidence in the record reflects that customers did not hear Harrell's exchange with Newson. (*See* Learned Dep. at 77:12-15.) But Harrell's co-workers report that customers did see and hear the exchange. (*See* King Decl. ¶ 3; Demry Decl. ¶ 3.) Harrell then left the office. (Harrell Dep. at 164:17-18; *see* King Decl. ¶ 3 (stating Harrell "stormed out of the building").) Harrell's co-workers believed Harrell had quit. (Learned Dep. at 30:2-6; *see also* Toft Ex. N.) Harrell asserts she never intended to resign from HMS. (Harrell Dep. at 161:21-162:6.)

Harrell's co-workers reported the incident to Learned, who investigated and reported the eyewitness accounts to Peterson. (Learned Dep. at 32:9-40:10.) Ultimately, HMS decided to give Harrell a corrective action for her unprofessional conduct on August 5th. (*See id.* at 46:6-23; Toft Decl., Ex. M.)

## V.    AUGUST 6, 2015

On August 6, 2015, Harrell met with Peterson regarding the changes to the Customer Service Department and told Peterson she felt Deters was "being set up to fail." (Harrell Dep. at 175:10-176:17; Toft Decl., Ex. C ("Peterson Dep.") at 161:15-23.) Peterson asked if Harrell had voiced her concerns to Bailey; Harrell responded that she had not and that Bailey made her uncomfortable. (Harrell Dep. at 176:14-17.) Harrell was upset about the temporary changes. (Peterson Dep. at 163:20-24.) Harrell made no mention of problems with her FMLA leave, discrimination, or retaliation. (*See* Harrell Dep. at 176:18-19.) On the same day, Harrell requested FMLA leave for August 7, 2015, which Peterson approved. (Toft Decl., Ex. O.)

## VI.    AUGUST 11, 2015, DISCIPLINE & TERMINATION

On August 11, 2015, Learned asked Harrell to come to Bailey's office.  (Harrell Dep. at 179:10-13.)   When Harrell arrived, Learned and Bailey presented her with a corrective action for "using profanity [and] angry, upset, [and] unprofessional conduct" on August 5th.  (Harrell Dep. at 179:14-18; Toft Decl., Ex. M.)   Learned and Bailey explained that three CSRs thought Harrell quit, used profanity, and made a scene in the showroom.  (Harrell Dep. at 180:7-13; *see also* Toft Decl., Ex. M.)  Bailey warned that "[t]his type of behavior and conduct [would] not be tolerated in the future.  Failure to observe these set of rules [would] result in further disciplinary action including termination."   (Harrell Dep. at 181:6-13; Toft Decl., Ex. M.)   Harrell denied the allegations in the corrective action and began to tell her side of the story.  (Harrell Dep. at 183:20-185:9; Learned Dep. at 51:11-21.)

According to Learned and Bailey, Harrell was dismissive of her co-workers' reports and attempted to shift the focus to short staffing in the Customer Service Department.  (Learned Dep. at 51:11-21; *see also* Bailey Dep. at 153:19-22 (indicating Harrell said "she didn't like [Bailey's] decisions on how the department should be run")).)  Bailey allegedly responded to Harrell:  "there seems like there's an excuse for everything with you."  (Learned Dep. at 52:6-12.)  Harrell responded "[t]here always is an excuse." (*Id.* at 52:11-12.)  Bailey allegedly responded:  "[n]o, there isn't.  Sometimes you just have to take responsibility."  (*Id.* at 52:13-15.)  Harrell then brought up that she actually went home to take care of her husband's disability.  (*Id.* at 57:15-19.)  And, at some point

in the conversation, Harrell exclaimed that HMS was trying to use her husband's disability against her. (*Id.* at 54:23-55:5.) And Harrell became tearful, upset, and said she was uncomfortable. (Bailey Dep. at 141:13-19, 144:12-14.)

In contrast, Harrell asserts that she immediately explained that her co-workers mistakenly interpreted her conduct on August 5th. (Harrell Dep. at 184:11-185:9.) Harrell allegedly explained that she "was upset and panicked and worried for [her] husband and that [she] needed to go home to take care of him, and that the team members were misinterpreting the situation." (*Id.* at 184:11-16.) Harrell stated that she explained "the truth [was] that [she] was leaving because [her] husband upset [her] and he" was going to react poorly and, perhaps, come into HMS if Harrell did not leave immediately. (*Id.* at 184:25-185:9.) According to Harrell, Bailey and Learned said "they didn't believe [her]" and Bailey said "he [didn't] understand why [Harrell] would have told [her] husband [about the temporary department changes] if [she] knew it would upset him." (*Id.* at 187:1-8; *see also* Learned Dep. at 58:19-23.) Harrell further attests that Bailey became visibly angry when Harrell accused him of using Harrell's husband's disability against her. (Harrell Dep. at 190:8-18.) The situation made Harrell uncomfortable. (*Id.* at 187:11.)

At this point, Deters and Peterson were asked to join the meeting. (*Id.* at 187:9-11; Bailey Dep. at 141:9-10.) Bailey "fill[ed] in [Deters] and [Peterson]," and then moved his chair near Harrell, shook his finger at Harrell, and stated "[y]ou are sitting here telling me that I am using your husband's disability. That's grossly offensive to me." (Harrell Dep. at 192:18-193:10.) Harrell alleges Bailey spit on her face while he

was talking to her. (*Id.* at 193:5.) Learned and Peterson then explained to Harrell that the "behavior [Harrell] exhibited while [she] left" on August 5th was the basis for the corrective action – not the fact that she left. (Learned Dep. at 65:3-11; *see also* Peterson Dep. at 138:2-139:8, 143:12-17.) Learned, Peterson, and Bailey assert that they knew Harrell's accusation was false and an attempt to derail the disciplinary action. (Learned Dep. at 69:9-12; Bailey Dep. at 76:8-17; Peterson Dep. at 151:3-7.)

The conversation finally culminated in Bailey stating that HMS and Harrell should consider an "exit strategy." (Bailey Dep. at 147:3-8; Harrell Dep. at 198:11-19.) There was no agreement that an "exit strategy" would actually happen or that HMS would ultimately terminate Harrell. (Peterson Dep. at 115:6-116:10, 155:4-5; Bailey Dep. at 146:17-147:8; Harrell Dep. at 198:11-199:12, 201:6-13.) Harrell was then dismissed from the meeting and, on the way out, uttered the phrase "[e]nriching lives" – HMS's mission statement – in a disparaging way. (Harrell Dep. at 198:2-199:18; Learned Dep. at 67:8-12.) Harrell admitted that she knew everyone at HMS took the mission of HMS seriously. (Harrell Dep. at 199:16-25.) Learned, Peterson, and Bailey understood that Harrell was mocking the mission of HMS, and after Harrell left the room, concurred that this conduct required immediate termination. (Peterson Dep. at 155:20-158:5; Learned Dep. at 67:11-18.)

Harrell walked back to her desk. (Harrell Dep. at 200:12-14.) Peterson found Harrell, asked her to return to Bailey's office, and Bailey terminated Harrell. (*Id.* at

200:16-201:1.)  HMS replaced Harrell with Demry – an employee on intermittent FMLA leave.[4]  (Demry Decl. ¶ 6.)

## VII.  PROCEDURAL HISTORY

Harrell filed the Complaint in Minnesota state court in March 2016.  (Notice of Removal ¶¶ 1-2.)  The Complaint alleged the following claims:  (1) reprisal under the MHRA for reporting discrimination and retaliation; (2) reprisal under the MHRA for associating with a disabled person; (3) marital status discrimination under the MHRA; and (4) violation of the FMLA when HMS "discharged Harrell for exercising her right to take FMLA leave."  (Compl. ¶¶ 42-60.)  HMS removed the case to federal court.  In February 2017, HMS moved for summary judgment on all claims.

## DISCUSSION

## I.  STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a summary judgment motion must view the facts in the light most favorable

---

[4] HMS approved Demry's FMLA request in June 2015, and promoted Demry to Lead CSR in September 2015.  (Demry Decl. ¶ 6.)

to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.    FMLA & MHRA

### A.    FMLA

Under the FMLA, an employee is entitled to twelve weeks of leave from work during any twelve-month period if the employee meets certain requirements. 29 U.S.C. § 2612(a)(1). Two subsections of the FMLA limit an employer's ability to undermine an employee's leave. Section 2615(a)(1) makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" rights provided under the FMLA. And section 2615(a)(2) makes it unlawful for "any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.

From these two subsections, the Eighth Circuit has recognized three unique FMLA claims: (1) entitlement, (2) retaliation, and (3) discrimination. *Pulczinski v. Trinity*

*Structural Towers, Inc.*, 691 F.3d 996, 1005-06 (8th Cir. 2012).  Here, Harrell alleged

FMLA claims under retaliation and discrimination theories.[5]

In the absence of direct evidence,[6] the Court analyzes FMLA claims under the

*McDonnell-Douglas* burden-shifting framework.  *Brown v. Diversified Distribution Sys.,*

---

[5] Both parties discuss Harrell's alleged "interference" claim.  The Court interprets Harrell's "interference" claim as a "discrimination" claim pursuant to 29 U.S.C. § 2615(a)(1), while recognizing that the Eighth Circuit began calling "interference" claims under section 2615(a)(1) "entitlement" claims in 2012.  *See Pulczinski v. Trinity Structural Towers, Inc.,* 691 F.3d 996, 1005-06 (8th Cir. 2012).  Here, Harrell did not assert an "entitlement" claim because Harrell admitted during her deposition that HMS never denied her an FMLA benefit, (Harrell Dep. at 97:5-9, 98:22-99:6), and, as such, Harrell cannot succeed on an entitlement claim, *Pulczinski,* 691 F.3d at 1005 (noting an entitlement claim "occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act").

[6] Harrell makes a very limited direct evidence argument with respect to her FMLA retaliation and MHRA reprisal claims.  Citing *Young-Losee v. Graphic Packaging International, Inc.,* 631 F.3d 909 (8th Cir. 2011), Harrell claims Bailey's angry reaction to Harrell's report of discrimination is sufficient direct evidence to survive a motion to dismiss.  (*See* Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. at 30-31, 35-36, Feb. 22, 2017, Docket No. 27.)  But "a general allegation of becoming upset" is not necessarily direct evidence of retaliation.  *Eason v. Walgreen Co.,* No. 13-3184, 2015 WL 4373656, at *10 (D. Minn. July 15, 2015); *see also Becker v. Jostens, Inc.,* 210 F. Supp. 3d 1110, 1119 (D. Minn. 2016) ("[S]imply being upset is not evidence upon which a reasonable fact finder could conclude that an illegitimate criterion actually motivated Becker's termination").

Further, Bailey's reaction to Harrell's report of discrimination is distinguishable from *Young-Losee.*  There, Young-Losee made numerous complaints and filed a "formal complaint" with human resources about alleged harassment.  *Young-Losee,* 631 F.3d at 911.  At a meeting **regarding the formal complaint**, "Young-Losee was not allowed to speak and, eventually, [the] supervisor] wadded up her complaint, threw it in the garbage can, told her it was 'total bullshit,' and said, 'I want you out of here.'"  *E.E.O.C. v. Prod. Fabricators, Inc.,* 763 F.3d 963, 972 n.2 (8th Cir. 2014).  In contrast, Harrell made her report of discrimination during a meeting **regarding her unprofessional conduct on August 5th**.  At this meeting, Harrell was permitted to explain her position regarding the discipline.  And, based on the circumstances, Bailey's conduct could be viewed as an "understandable reaction" when record evidence shows Bailey was upset because he prides himself on acting favorably toward employees with regard to FMLA and other kinds of leave.  *See Becker,* 210 F. Supp. 3d at 1119; *Eason,* 2015 WL 4373656, at *10; (Bailey Dep. at 78:18-79:21, 132:12-15, 135:8-10; Learned Dep. at 68:4-17; see also Harrell Dep. at 183:22-184:8).  Thus, the Court finds Bailey's reaction is indirect evidence of

(Footnote continued on next page.)

*LLC*, 801 F.3d 901, 908 (8th Cir. 2015). Under the *McDonnell-Douglas* framework, Harrell must first make a prima facie case for discrimination and/or retaliation. *Becker v. Jostens, Inc.*, 210 F. Supp. 3d 1110, 1119 (D. Minn. 2016). If Harrell establishes a prima facie case, the burden shifts to HMS "to articulate a legitimate, non-retaliatory [or non-discriminatory] reason for its action." *Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1077-78 (8th Cir. 2010). "The burden then shifts back to [Harrell] to put forth evidence of pretext, the ultimate question being whether a 'prohibited reason, rather than the proffered reason, actually motivated the employer's action.'" *Id.* (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006)).

## B.    MHRA

The MHRA prohibits both direct discriminatory practices and reprisal for engaging in certain protected practices. *See* Minn. Stat. §§ 363A.08, 363A.15. Under the MHRA:

> It is an unfair discriminatory practice for any individual who participated in the alleged discrimination as a[n] . . . employer . . . to intentionally engage in any reprisal[7] against any person because that person:

_____

(Footnote continued.)

retaliation and will analyze Harrell's FMLA retaliation and MHRA reprisal claims using the *McDonnell-Douglas* framework.

[7] The statute defines "reprisal" as follows:

> A reprisal includes . . . any form of intimidation, **retaliation**, or harassment. It is a reprisal for an employer to do any of the following . . . : refuse to hire the individual; depart from any customary employment practice; transfer or assign the individual to a lesser position in terms of wages, hours, job classification, job

(Footnote continued on next page.)

(1) opposed a practice forbidden under this chapter or has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter; or

(2) associated with a person or group of persons who are disabled or who are of different race, color, creed, religion, sexual orientation, or national origin.

Minn. Stat. § 363A.15.  The MHRA further provides that

it is an unfair employment practice for an employer, because of . . . marital status . . . to:

(1) refuse to hire or to maintain a system of employment which unreasonably excludes a person seeking employment; or

(2) discharge an employee; or

(3) discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment.

Minn. Stat. § 363A.08, subd. 2.  Minnesota defines "marital status" broadly to include "protection against discrimination on the basis of the identity, **situation**, **actions**, or **beliefs** of a spouse or former spouse."  Minn. Stat. § 363A.03, subd. 24 (emphasis added).

In the absence of direct evidence, Minnesota courts have applied the *McDonnell-Douglas* burden-shifting framework to the MHRA.  *Fletcher v. St. Paul Pioneer Press*,

_____

(Footnote continued.)

security, or other employment status; or inform another employer that the individual has engaged in the activities listed in clause (1) or (2).

Minn. Stat. § 363A.15 (emphasis added).

589 N.W.2d 96, 101 (Minn. 1999) (reprisal); *Gunnufson v. Onan Corp.*, 450 N.W.2d 179, 182 (Minn. Ct. App. 1990) (marital status discrimination).

## III.   MCDONNELL-DOUGLAS FRAMEWORK

### A.   Prima Facie Case

#### 1.   *FMLA Retaliation*

HMS first argues Harrell failed to set forth a prima facie case for FMLA retaliation. To establish a prima facie case of FMLA retaliation, Harrell must show: (1) she engaged in protected activity when she complained HMS was punishing her because she exercised her FMLA rights, (2) she suffered an adverse employment action, and (3) a causal connection between the protected activity and the adverse employment action. *Brown*, 801 F.3d at 909. The only element in dispute is whether Harrell presented sufficient evidence to show a causal connection between her report that she was being discriminated against for taking FMLA leave and HMS's decision to terminate her employment.

In order to satisfy the causal connection element "[i]t is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 819 (8th Cir. 2017) (alteration in original) (quoting *Blomker v. Jewell*, 831 F.3d 1051, 1059 (8th Cir. 2016)). Instead, "[r]etaliation must be the 'but for' cause of the adverse employment action." *Id.* (alteration in original) (quoting *Blomker*, 831 F.3d at 1059). As a general rule, "more than a temporal connection between the protected conduct and the adverse employment action is

required" to show a causal connection between a protected activity and an adverse action. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999). But when mere days elapse between an employee's FMLA complaint and termination, "temporal proximity provides strong support for an inference of retaliatory intent." *Brown*, 801 F.3d at 909 (quoting *Wallace*, 442 F.3d at 1122).

Here, while HMS presented evidence that Harrell made a post-hoc complaint after being informed of a disciplinary action, *see Griffith v. City of Des Moines*, 387 F.3d 733, 738-39 (8th Cir. 2004), the Court finds there is sufficient evidence to show a causal connection. It is undisputed that HMS did not intend to terminate Harrell until after she reported discrimination for taking FMLA leave. And, most importantly, the temporal proximity between Harrell reporting her belief that she was being punished for taking FMLA leave and her ultimate termination was a matter of minutes. Thus, if there is any case where temporal proximity alone could show an inference of a causal connection – it is this case. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001))).

Therefore, the Court finds Harrell presented sufficient evidence to meet her burden of setting forth a prima facie case for FMLA retaliation.

## 2. *FMLA Discrimination*

HMS next argues Harrell failed to set forth a prima facie case for FMLA discrimination. To establish a prima facie case of FMLA discrimination, Harrell must show: (1) she engaged in protected activity when she took FMLA leave, (2) she suffered a materially adverse employment action, and (3) a causal connection existed between Harrell's FMLA leave and the adverse employment action. *Pulczinski*, 691 F.3d at 1007. Again, the only element in dispute is whether Harrell presented sufficient evidence to show a causal connection, i.e. whether Harrell's use of FMLA leave "played a part" in HMS's decision to terminate Harrell's employment. *See Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 963 n.3 (8th Cir. 2012) (quoting *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006)); *see* 29 C.F.R. § 825.220(c) (adopting a "negative factor" standard).

"An employee can establish a causal link between her protected activity and the adverse employment action through 'the timing of the two events.'" *Hite*, 446 F.3d at 866 (quoting *Eliserio v. United Steelworkers of Am.*, 398 F.3d 1071, 1079 (8th Cir. 2005)). "Temporal evidence should generally be corroborated by other evidence of employment discrimination." *Marez*, 688 F.3d at 963. Further, "[c]ases in which . . . temporal proximity alone was sufficient to create an inference of the causal link have uniformly held that the temporal proximity must be very close." *Id.* (quoting *Hite*, 446 F.3d at 866); *see also Smith*, 302 F.3d at 832-33 (discussing cases in which temporal proximity has or has not been considered sufficient).

For her FMLA discrimination claim, Harrell not only presents evidence of temporal proximity between her use of FMLA leave and her termination (three days), Harrell also presents other evidence of employment discrimination. In particular, the parties agree that Bailey made a statement at the August 5th meeting that "he knew something was going on in [Harrell's] life" and, even so, Bailey wanted Harrell to invest more time in HMS. Coupled with the evidence that Bailey acted aggressively when Harrell brought up her FMLA leave, the Court finds Harrell presented sufficient evidence to show a prima facie case for FMLA discrimination.

### 3. *MHRA Reprisal – Associating with Disabled Persons*

HMS asserts that it is entitled to summary judgment on Harrell's MHRA reprisal claim with respect to her association with a disabled person – her husband. To establish a prima facie case for a reprisal claim, Harrell must establish the following elements: "(1) statutorily-protected conduct by the employee; (2) [an] adverse employment action by the employer; and (3) a causal connection between the two." *Hoover v. Norwest Private Mortg. Banking,* 632 N.W.2d 534, 548 (Minn. 2001) (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 444 (Minn. 1983)).

HMS argues it is entitled to summary judgment on Harrell's reprisal claim because Harrell failed to establish that she is associated with a person who has a disability that "materially limits one or more major life activities." *See* Minn. Stat. § 363A.03, subd. 12. Harrell responds that she does not have authority to release her husband's

records and HMS already has records showing her husband has a "serious health condition."[8]

Under the MHRA, the word "disability" is defined as:

> any condition or characteristic that renders a person a disabled person. A disabled person is any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.

Minn. Stat. § 363A.03, subd. 12. "Major life activities include caring for one's self, performing manual tasks, walking, seeing, hearing, breathing, learning and working." *Bolin v. Japs-Olson Co.*, No. 06-3574, 2008 WL 1699531, at *4 (D. Minn. Apr. 9, 2008). "An individual is materially limited in the life activity of working if he is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" *Id.* (quoting *Kellogg v. Union Pac. R.R. Co.*, 233 F.3d 1083, 1087 (8th Cir. 2000)). An individual is "regarded as" disabled when others regard him or her as having an impairment which materially limits one or more major life activities. *Fischer v. Minneapolis Pub. Sch.*, 16 F. Supp. 3d 1012, 1016 n.4 (D. Minn. 2014).

Harrell bears the burden of showing that her husband has a disability as defined by the MHRA and Harrell presented no evidence as part of the motion for summary

---

[8] To satisfy the FMLA's definition of a "serious health condition," Harrell was required to show her husband had "an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). This standard is less stringent than that required to show a disability under the MHRA.

judgment that her husband meets this definition. In analogous discrimination claims, the Court dismissed cases where the plaintiff provided more evidence of an individual's disability than Harrell provided here. *See, e.g.*, *Bolin*, 2008 WL 1699531, at \*4; *Land v. Washington Cty.*, No. 99-1255, 2001 WL 228441, at \*3 (D. Minn. Mar. 5, 2001). Therefore, the Court finds Harrell failed to create a genuine issue of material fact regarding her husband's disability, and the Court will grant HMS's motion for summary judgment on that ground.

### 4. *MHRA Reprisal – Reporting Discrimination*

HMS also asserts Harrell failed to set forth a prima facie case for reprisal based on reporting discrimination. As set forth above, to allege an MHRA reprisal claim, Harrell must establish: "(1) statutorily-protected conduct by the employee; (2) [an] adverse employment action by the employer; and (3) a causal connection between the two." *Hoover*, 632 N.W.2d at 548 (quoting *Hubbard*, 330 N.W.2d at 444).

HMS argues Harrell's MHRA reporting discrimination claim fails because Harrell did not engage in protected conduct. To support this argument, HMS relies on *Griffith* and argues Harrell failed to allege statutorily protected conduct in good faith because she did not report discrimination based on her husband's disability until after she received the corrective action. 387 F.3d at 738-39. Reviewing *Griffith*, however, the Eighth Circuit held a report after disciplinary action commenced goes to whether there is an "inference of a retaliatory motive" – not whether the plaintiff engaged in protected conduct. 387 F.3d at 738-39. Further, the record shows Harrell reported that she felt the August 11th

corrective action occurred because she asked for leave to take care of her husband on August 5th. (*See* Harrell Dep. at 189:3-6.)

HMS also claims Harrell cannot satisfy the causal connection element – alleging Harrell cannot show her report of discrimination was the but-for cause of her termination. But, as pointed out by Harrell, "Minnesota courts have not addressed . . . whether the . . . but-for causation standard . . . applies for reprisal claims under the MHRA." *Liles*, 851 F.3d at 819 (quoting *Musolf v. J.C. Penney Co.*, 773 F.3d 916, 919 (8th Cir. 2014)). Thus, the Court must assess whether "evidence [exists] of circumstances that justify an inference of retaliatory motive, such as a showing that the employer has actual or imputed knowledge of the protected activity and the adverse employment action follows closely in time." *Id.* (quoting *Dietrich v. Canadian Pac. Ltd.*, 536 N.W.2d 319, 327 (Minn. 1995)). In certain circumstances, temporal proximity is sufficient under the MHRA to satisfy the causal connection element. *Hubbard*, 330 N.W.2d at 445 ("We find that the inference arising from [the defendant's] discharge of [the plaintiff] only 2 days after service of the complaint in this action is sufficient to show retaliatory motive for purposes of [the plaintiff's] prima facie case.").

As stated above, the temporal proximity between Harrell reporting her belief that she was being punished for leaving work to help her disabled husband and her ultimate termination was a matter of minutes. Thus, this is a case where temporal proximity alone creates an inference of a causal connection. *See Smith*, 302 F.3d at 833. Further, while HMS argued that Harrell made a post-hoc complaint after being informed of a disciplinary action, *see Griffith*, 387 F.3d at 738-39, it is undisputed that HMS did not

intend to terminate Harrell until after she reported discrimination for taking leave to assist her husband.

Therefore, the Court finds Harrell set forth a prima facie MHRA reprisal claim for reporting discrimination.

### 5.     *MHRA Marital Status Discrimination*

HMS finally argues Harrell failed to meet her burden of setting forth a prima facie[9] case of marital status discrimination.     To set forth a prima facie case of

---

[9] Harrell asserts her claim should survive summary judgment because she has direct evidence HMS terminated Harrell because of her marital status.  "Direct evidence [of marital status discrimination] is evidence of conduct or statements by the employer's decisionmakers sufficient to permit a fact-finder to infer that the discriminatory attitude was more likely than not a motivating factor in the employer's adverse employment decision."  *Taylor v. LSI Corp. of Am.*, 781 N.W.2d 912, 917 (Minn. Ct. App. 2010).  "Direct evidence in this context must be strong enough to show 'a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the employment decision."  *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 965 (8th Cir. 2006) (alteration in original) (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)).

As direct evidence, Harrell points to:  (1) Bailey's statement that he did not "understand why [Harrell] would have told [her] husband [about the changes in the Customer Service Department] if [she] knew it would upset him," (Harrell Dep. at 187:5-8; *see also* Bailey Dep at 140:5-10; Learned Dep. at 58:19-59:5); (2) Bailey's statement after Harrell refused to sign the corrective action that "clearly [HMS] has made [Harrell] and [her] family unhappy, [the family is] not happy, and so maybe [HMS and Harrell] should – can find an exit strategy . . . that would work nicely for everybody," (Harrell Dep. at 198:8-19); and (3) Bailey's notes after the August 11th meeting, (Thome Decl., Ex. H).  But Bailey did not make these comments in a vacuum.  *See Wagner v. Gallup, Inc.*, 788 F.3d 877, 884 (8th Cir. 2015).  And, when viewed in context, even though stated by the decisionmaker, these comments do not establish an inference of animus against Harrell's husband's beliefs or situation – or Harrell's status as a married woman – as is required to use the direct method.  *Id.* at 884-85.  All of Bailey's comments about Harrell's husband were made in response to Harrell's assertions (*see* Harrell Dep. at 184:25-185:9, 195:5-16); for example, Bailey's alleged comment that Harrell should have an exit strategy because HMS made her "family unhappy" was made in the context of Harrell's repeated complaints

(Footnote continued on next page.)

discrimination, Harrell must show: "(1) she is a member of a protected group; (2) she was qualified for her position; (3) she was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination."[10]  *Doucette v. Morrison Cty.*, 763 F.3d 978, 982 (8th Cir. 2014).  Minnesota defines "marital status" to include "protection against discrimination on the basis of the identity, situation, actions, or beliefs of a spouse or former spouse."  Minn. Stat. § 363A.03, subd. 24.

HMS first asserts Harrell cannot show that she was qualified for her position because she repeatedly engaged in unprofessional conduct.  To be "qualified" under the MHRA, Harrell must show that she met the minimum "objective qualifications for the job."  *Legrand v. Trs. of Univ. of Ark. at Pine Bluff*, 821 F.2d 478, 481 (8th Cir. 1987).  Here, the record shows Harrell met the objective qualifications for the Lead CSR position.  In her last evaluation, Deters rated Harrell as "exceeds expectations."  (Thome Decl., Ex. B at 20.)  After that date, Harrell received one report against her for becoming

_____

(Footnote continued.)

about her husband's perception of HMS.  (*Id.* at 195:2-197:20.)  Further weighing against a showing of direct evidence is Harrell's own admission that HMS never "took any action against [her] simply because of the fact that [she was] married."  (*Id.* at 218:9-16.)  Under these circumstances, Harrell failed to establish an inference of animus such that Harrell presented direct evidence of marital status discrimination.  *See Wagner*, 788 F.3d at 884-85.

[10] HMS argues Harrell's marital status claim per se fails because she cannot identify a single similarly-situated person who was treated better.  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 25, Feb. 1, 2017, Docket No. 19 (citing *Freeman v. Ace Tel. Ass'n*, 404 F. Supp. 2d 1127, 1136 (D. Minn. 2005)).  The Minnesota Supreme Court has held that "[t]he specific elements of the *McDonnell Douglas* court's formulation of the plaintiff's prima facie case . . . must be modified for varying factual patterns and employment contexts."  *Sigurdson v. Isanti Cty.*, 386 N.W.2d 715, 720 (Minn. 1986).  The elements listed above are commonly used when analyzing discrimination claims under the MHRA.

"defensive with [a] [customer]," but there is no indication HMS considered termination. (Toft Decl., Ex. I at 290.)[11]  Further, even after the August 5th incident, HMS only planned to give Harrell a corrective action – not terminate her employment.  Therefore, the record shows Harrell was qualified for her position.

HMS also argues Harrell failed to show circumstances giving rise to an inference of discrimination.  To satisfy this element, Harrell must show a "connection between [Harrell's] protected status and her termination.  Such an inference arises when it is more likely than not that the employer's actions were based on unlawful discrimination." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993-94 (8th Cir. 2011).

Here, Harrell points to three pieces of evidence regarding Bailey's conduct to support an inference of discrimination.  Specifically:  (1) Bailey's statement that he didn't "understand why [Harrell] would have told [her] husband [about the changes in the Customer Service Department] if [she] knew it would upset him," (Harrell Dep. at 187:5-8; *see also* Bailey Dep. at 140:5-10; Learned Dep. at 58:19-59:5); (2) Bailey's statement after Harrell refused to sign the corrective action that "clearly [HMS] has made [Harrell] and [her] family unhappy, [the family is] not happy, and so maybe [HMS and Harrell] should – can find an exit strategy . . . that would work nicely for everybody," (Harrell Dep. at 198:8-19); and (3) Bailey's notes after the August 11th meeting, (Thome Decl., Ex. H).

---

[11]     The page numbers cited for Exhibit I are to the Bates numbers indicated on the document with the omission of all "0s" preceding the number.

Looking at the facts in the light most favorable to Harrell, Bailey's alleged statement that HMS and Harrell should consider an exit strategy because "clearly [HMS] has made [Harrell] and [her] family unhappy," (Harrell Dep. at 198:8-19), is some evidence leaning toward an inference of discrimination. Specifically, it could show that just prior to terminating Harrell, Bailey expressed that if an individual's spouse is not happy with HMS then HMS does not want the individual employed at HMS.

Further, the temporal proximity between Harrell's termination and Bailey's comments support an inference of discrimination. As stated above, temporal proximity is generally not enough by itself to create an inference of discrimination, it can be one important factor. And here the comments regarding Harrell's husband were made just minutes before her termination. *See Smith*, 302 F.3d at 833. Thus, the Court finds Harrell set forth a prima facie case for marital status discrimination.

### B.     Legitimate Non-Discriminatory or Non-Retaliatory Reason

Because the Court finds Harrell established a prima facie case on the FMLA claims and two MHRA claims, the Court must next decide whether HMS set forth a legitimate, non-retaliatory or non-discriminatory reason for terminating Harrell. Harrell argues the Court should deny HMS's motion for summary judgment because HMS failed to meet its burden of presenting a reason for putting Harrell on an "exit strategy."

The Court does not find Harrell's argument compelling that the discussion of an "exit strategy" during the August 11th meeting amounts to an adverse employment action. The record plainly shows that, prior to Harrell's "enriching lives" statement, there was no

agreement that an "exit strategy" would actually happen or that Harrell would ultimately be terminated. (Peterson Dep. at 115:6-116:10, 155:4-5; Bailey Dep. at 146:17-147:8; Harrell Dep. at 198:11-199:12, 201:6-13.) Therefore, the Court finds the adverse employment action occurred when Harrell was actually terminated – not when the parties discussed the potential for an "exit strategy." *Black v. Indep. Sch. Dist. No. 316*, 476 F. Supp. 2d 1115, 1123 (D. Minn. 2007) ("To establish an adverse employment action, a plaintiff must do more than allege that actions taken by her employer created the potential for harm; rather, she must show some tangible harm flowing from the employer's actions."); *see also Burchett v. Target Corp.*, 340 F.3d 510, 518 (8th Cir. 2003) (negative performance review alone not adverse employment action).

Reviewing the record, HMS presents sufficient evidence to support its assertion that Harrell was terminated because she "mocked [HMS's] mission despite repeated prior warnings for unprofessional conduct and a corrective action only minutes beforehand." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 22, Feb. 1, 2017, Docket No. 19; *see also* Learned Dep. at 67:8-23; Peterson Dep. at 155:13-158:5.) Harrell's co-workers all testified to Harrell's unprofessional conduct on August 5th, Harrell agreed the corrective action was taken for that reason, Harrell admits to making the "enriching lives" statement, and Harrell concedes she knew the statement would be offensive to the leadership team.

Therefore, the Court finds HMS presented sufficient facts to show a legitimate non-retaliatory and non-discriminatory reason for terminating Harrell's employment after the "enriching lives" comment.

**C.     Pretext**

Because the Court finds HMS met its burden of showing a legitimate, non-retaliatory and non-discriminatory reason for terminating Harrell's employment, the Court must decide whether Harrell met her burden of showing pretext.   A pretext "'inquiry is limited to whether the employer gave an honest explanation of its behavior,' not whether its action was wise, fair, or correct." *McKay v. U.S. Dep't of Transp.*, 340 F .3d 695, 700 (8th Cir. 2003) (quoting *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994)).   "A plaintiff may demonstrate a material question of fact regarding pretext in at least two ways, either by showing 'that the employer's explanation is unworthy of credence because it has no basis in fact' or 'by persuading the court that a prohibited reason more likely motivated the employer.'"   *Doering v. Wal-Mart Stores, Inc.*, No. 12-2629, 2014 WL 3395745, at *12 (D. Minn. July 11, 2014) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011)).   A plaintiff may meet this standard "by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).

Here, HMS's asserted legitimate, non-discriminatory and non-retaliatory reason for terminating Harrell is that Harrell "mocked [HMS's] mission despite repeated prior warnings for unprofessional conduct and a corrective action only minutes beforehand."

(Def.'s Mem. in Supp. of Mot. for Summ. J. at 22.)  The Court must review Harrell's assertions of pretext in light of this justification.  *Smith*, 302 F.3d at 834.

Significant evidence weighs against the Court finding pretext with regard any of Harrell's claims.  First, HMS replaced Harrell with another employee on intermittent FMLA leave, (*see* Demry Decl. ¶ 6), providing strong evidence HMS's asserted reason for terminating Harrell is not pretextual, *see Lake*, 596 F.3d at 874 (explaining evidence that similarly-situated employees are treated in a disparate manner is evidence of pretext); *Stewart v. Rise, Inc.*, 791 F.3d 849, 859 (8th Cir. 2015) (in a hostile work environment case, finding insufficient evidence of a discriminatory termination where "the terminated employee herself was a supervisor over the alleged offenders, and members of the same protected class preceded and followed her in the exact same supervisory position"). Second, HMS permitted Harrell to take FMLA leave on numerous occasions, and, as a general rule, this is strong evidence that HMS was not hostile to the protected activity. *See Burciaga v. Ravago Ams. LLC*, 791 F.3d 930, 937 (8th Cir. 2015); *see also Chappell v. Bilco Co.*, 675 F.3d 1110, 1120 (8th Cir. 2012) ("[Chappell's] numerous uses of FMLA leave without negative consequences support Bilco's non-discriminatory and non-retaliatory justification for Chappell's termination.").

As to all claims, Harrell relies on three pieces of evidence to assert that fact issues remain over whether the proffered reason for her termination was pretextual:  (1) Bailey's angry response at the August 11th meeting; (2) HMS's failure to follow the HMS policy for investigating harassment complaints; and (3) HMS's response to Harrell's August 5th

conduct changed after the August 11th meeting. Reviewing the evidence, each is insufficient to create a fact issue.

First, "simply being upset is not evidence upon which a reasonable fact finder could conclude that an illegitimate criterion actually motivated" an employee's termination and an employer's angry reaction can, in some instances, be "an understandable reaction." *Becker v. Jostens, Inc.*, 210 F. Supp. 3d 1110, 1119 (D. Minn. 2016). Here, the record shows that Bailey was visibly upset when Harrell accused Bailey of punishing Harrell for leaving to assist her husband. (Harrell Dep. at 190:8-16; Deters Dep. at 28:19-29:15; Learned Dep. at 62:21-63:3.) But the evidence also shows Bailey was upset because HMS provides services to disabled people and, as such, Bailey prides himself on acting favorably toward employees with regard to FMLA and other kinds of leave. (*See* Bailey Dep. at 78:18-79:21, 132:12-15, 135:8-10; Learned Dep. at 68:4-17; *see also* Harrell Dep. at 183:22-184:8.) Thus, Bailey's anger is not enough, by itself, to show pretext.

Second, Harrell correctly points out that an employer's failure to follow its own policies can be evidence of pretext. *Lake*, 596 F.3d at 874. But "the mere allegation that [HMS] failed to follow its own policies, even if true, is insufficient as a matter of law to prove pretext." *Naguib v. Trimark Hotel Corp.*, No. 15-3966, 2017 WL 598760, at *9 (D. Minn. Feb. 14, 2017). Further, "[t]he appropriate scope of investigation is a business judgment, and shortcomings in an investigation do not by themselves support an inference of discrimination." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782,

795 (8th Cir. 2011) (quoting *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 863 (8th Cir. 2009)).

Here, the record plainly shows that HMS neither asked Harrell to put her complaint in writing nor investigated the complaint made on August 11th – as indicated by HMS's "Team Member Handbook" and "Code of Ethics." (Peterson Dep. at 145:18-147:21, 150:24-151:21; Bailey Dep. at 76:5-78:16, 83:18-85:8.) But Peterson testified that a written complaint was not necessary because Harrell's statement "didn't come off . . . as . . . an official complaint." (Peterson Dep. at 151:13-15.) Bailey agreed, stating "[t]here was nothing to investigate." (Bailey Dep. at 76:6-7.) In addition, reading the plain language of the policy, no investigation was actually **required**. (*See* Thome Decl., Ex. L at 83 (explaining that the investigation will depend upon "the circumstances of the matter").) Thus, while the lack of investigation may provide some limited circumstantial evidence of pretext, by itself it is not enough to persuade the Court that any of Harrell's asserted protected activity caused her termination; as opposed to her unprofessional conduct on August 11th.

Third, the Court is not convinced by Harrell's argument that, because the purpose of the August 11th meeting was to give a **corrective action**, Harrell's termination is evidence of pretext. *See Lake*, 596 F.3d at 874. HMS's stated reason for terminating Harrell was that "mocked [HMS's] mission [during the August 11th meeting] despite repeated prior warnings for unprofessional conduct and a corrective action only minutes beforehand." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 22.) Harrell admitted that she made the "enriching lives" statement and that she knew her comment was offensive.

(Harrell Dep. at 198:2-5, 199:13-25.)  Numerous cases hold that an admission to offending conduct weighs against finding pretext.  *See, e.g.*, *Burciaga*, 791 F.3d at 937 (noting appellant "admitted she made the shipping errors at issue"); *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir. 1994) (noting that "plaintiff generally admitted that the four incidents occurred").  Further, because Harrell admits to the offending conduct, Harrell cannot rely on the original corrective action prior to making the offending "enriching lives" remark.

For these reasons, the Court finds Harrell failed to create a genuine issue of material fact on the pretext element on both her FMLA and MHRA claims, and the Court will grant HMS's motion for summary judgment.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Handi Medical Supply, Inc.'s Motion for Summary Judgment  [Docket No. 17] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  September 28, 2017
at Minneapolis, Minnesota.

_____s/John R. Tunheim_____
JOHN R. TUNHEIM
Chief Judge
United States District Court